## No. 22-15485

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————

RONALD HITTLE,
*Plaintiff-Appellant*,

*v.*

CITY OF STOCKTON, CALIFORNIA; ROBERT DEIS; LAURIE
MONTES,
*Defendants-Appellees*,

————————

Appeal from the United States District Court
for the Eastern District of California
Civil Case No. 2:12-cv-00766-TLN-KJN

————————

**MOTION FOR LEAVE TO FILE BRIEF OF *AMICUS
CURIAE* ROBERTSON CENTER FOR
CONSTITUTIONAL LAW IN SUPPORT OF PETITION
FOR REHEARING EN BANC**

————————

Christopher T. Holinger
*Robertson Center for
Constitutional Law*
REGENT UNIVERSITY SCHOOL OF LAW
1000 Regent University Drive
Virginia Beach, VA 23464
Tel. 757-352-4908

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

The Robertson Center for Constitutional Law is an academic center within Regent University School of Law, which has no parent corporation and issues no stock. Accordingly, no publicly held corporation owns ten percent or more of its stock.

s/ *Christopher T. Holinger*
Christopher T. Holinger

Proposed *amicus curiae* Robertson Center for Constitutional Law respectfully submits this Motion for Leave to File Brief as *Amicus Curiae* in Support of Plaintiff-Appellant's Motion for Rehearing en banc. *Amicus Curiae* attempted to obtain the consent all parties to the filing of this brief. The proposed brief accompanies this motion.

## I. Proposed *amicus* has an interest in the outcome of this matter.

Proposed *amicus* is an academic center within Regent University School of Law. Established in 2020, the Center pairs advocacy and scholarship to advance first principles in constitutional law, including religious liberty and the rule of law. The Center regularly represents organizations from various faith traditions that support religious freedom and rights of conscience.

Proposed *amicus* has a strong interest in the outcome of this case. The erosion of constitutional and statutory protections for religious expression threatens religious employees, especially those of minority faiths. The Robertson Center for Constitutional Law has a strong interest in ensuring all religious Americans receive the Constitution's and Title VII's full protection.

II.    **This matter involves a novel and complex issue worthy of en banc review, making *amicus* involvement appropriate.**

The Supreme Court and this Court have both recently warned against applying ostensibly neutral rules to religious groups and individuals in a non-neutral manner. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1723–24 (2018); *see also Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, 2023 WL 5946036, at *18–21 (9th Cir. Sept. 13, 2023). Here, the words and actions of Chief Hittle's supervisors and the purportedly neutral investigator show that they were all motivated by an unacceptable level of anti-religious bias that tainted the entire process. This Court should refuse to give such religious animus the benefit of the doubt when resolving Title VII discrimination claims. Otherwise, it risks violating this country's longstanding commitment to religious toleration and free exercise.

Further, the panel's deference to the concerns and perceptions of others merely dresses the outdated *Lemon* endorsement test in Title VII's clothing. Coworkers' dislike of or hostility to religion are "'off the table' for consideration" of whether there is an "undue hardship" to the employer in accommodating a religious practice. *Groff v. DeJoy* 143 S.Ct.

2279, 2290 n.9 (2023). Allowing such hostility to override a Title VII discrimination claim conflicts with the Supreme Court's First Amendment and Title VII precedents.

The panel failed to appreciate subtle yet important changes in religious liberty law. En banc review will allow the full Court to preserve clarity in the jurisprudence of this Circuit in light of recent Supreme Court decisions and an en banc decision from this Court.

Because of its experience with religious liberty and First Amendment advocacy, proposed *amicus* is well positioned to explain these critical religious liberty issues. Accordingly, proposed *amicus* respectfully requests that this Court grant this motion and accept for filing the attached *amicus* brief.

Date: September 15, 2023     Respectfully submitted,

s/*Christopher T. Holinger*
Christopher T. Holinger, VSB #92693
*Robertson Center for*
*Constitutional Law*
REGENT UNIVERSITY SCHOOL OF LAW
1000 Regent University Drive
Virginia Beach, VA 23464
Tel. 757-352-4908

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the requirements of Fed. R. App. P. 27(d) and 9th Cir. R. 21-1(1)(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font, contains 487 words, and is less than 20 pages.

s/*Christopher T. Holinger*
Christopher T. Holinger

Date: September 15, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 15, 2023. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

s/*Christopher T. Holinger*
Christopher T. Holinger

## No. 22-15485

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

RONALD HITTLE,
*Plaintiff-Appellant,*

*v.*

CITY OF STOCKTON, CALIFORNIA, ET AL.,
*Defendants-Appellees,*

———————————

Appeal from the United States District Court
for the Eastern District of California
Civil Case No. 2:12-cv-00766-TLN-KJN

———————————

**BRIEF OF *AMICUS CURIAE* ROBERTSON CENTER
FOR CONSTITUTIONAL LAW IN SUPPORT OF
PETITION FOR REHEARING EN BANC**

———————————

Christopher T. Holinger
  *Counsel of Record*
Bradley J. Lingo
J. Alex Touchet
*Robertson Center for
  Constitutional Law*
REGENT UNIVERSITY SCHOOL
  OF LAW
1000 Regent University
  Dr., Ste. 303
Virginia Beach, VA 23464

## CORPORATE DISCLOSURE STATEMENT

The Robertson Center for Constitutional Law is an academic center within Regent University School of Law, which has no parent corporation and issues no stock. Accordingly, no publicly held corporation owns ten percent or more of its stock.


s/ *Christopher T. Holinger*
Christopher T. Holinger

# TABLE OF CONTENTS

INTEREST OF AMICUS ............................................................. 1

SUMMARY OF ARGUMENT ................................................... 1

ARGUMENT .............................................................................. 3

  I.  Hostility Toward Religious Beliefs On Purportedly "Neutral" Grounds Cannot Stand. ....................................................... 6

    A.  The Constitution Demands "Neutral And Respectful Consideration" Of Religious Activity. ............................ 6

    B.  Chief Hittle Did Not Receive A "Neutral And Respectful" Inquiry Of His Religious Practice. ................................ 9

  II.  A Coworker's Hostility To Religion Does Not Insulate An Employer From The Requirements Of Title VII. .......................... 12

    A.  The Supreme Court Has Held That Perceptions and Discomfort Do Not Justify Government Censorship. ................................. 13

    B.  The Panel's Explanation Repeats Arguments That The Supreme Court Has Rejected. .................................................. 16

CONCLUSION ......................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Berry v. Dep't of Soc. Servs.*,
447 F.3d 642 (9th Cir. 2006).................................................... 17

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020)........................................................... 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993)........................................................... 2, 10

*Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*,
492 U.S. 573 (1989)............................................................... 14

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015)......................................................... 16, 19

*Fellowship of Christian Athletes v. San José Unified Sch. Dist. Bd. of
Educ.*,
No. 22-15827, 2023 WL 5946036 (9th Cir. Sept. 13, 2023)......... passim

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001).............................................................. 15

*Groff v. DeJoy*,
143 S. Ct. 2279 (2023)................................................... passim

*Hittle v. City of Stockton*,
76 F.4th 877 (9th Cir. 2023) ......................................... passim

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022).................................................. passim

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993)............................................................ 15

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
 138 S. Ct. 1719 (2018).................................................................. passim

*Murdock v. Pennsylvania*,
 319 U.S. 105 (1943) ................................................................. 14

*Reno v. ACLU*,
 521 U.S. 844 (1997) ................................................................. 14

*Terminiello v. City of Chicago*,
 337 U.S. 1 (1949) ..................................................................... 14

*Waln v. Dysart Sch. Dist.*,
 54 F.4th 1152 (9th Cir. 2022) ........................................... 13, 15

## **Statutes**

42 U.S.C. § 2000e–2(a)(1) ........................................................... 8

## **Other Authorities**

Appellant's Petition for Rehearing En Banc, *Hittle v. City of Stockton*,
 76 F.4th 877 (9th Cir. 2023) (No. 22-15485) ........................................ 13

## INTEREST OF AMICUS

The Robertson Center for Constitutional Law is an academic center within the Regent University School of Law. Established in 2020, the Center pairs scholarship and advocacy to advance first principles in constitutional law, including religious liberty and the rule of law. The Center regularly represents organizations from various faith traditions that support religious freedom and rights of conscience. Accordingly, the Center is interested in ensuring that religious Americans of all faiths receive the full protection afforded by the Constitution and Title VII.[1]

## SUMMARY OF ARGUMENT

Appellees' briefs and the panel opinion go to great lengths attempting to show that Chief Hittle was dismissed for neutral and nondiscriminatory reasons. But the words and actions of his supervisors and the purportedly neutral investigator show that they were motivated by anti-religious bias that tainted the entire process. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1723–24

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or other person or entity (other than amicus and its counsel) contributed money intended to fund the preparation or submission of this brief.

(2018) (warning against applying neutral rules against religious groups and individuals in a non-neutral manner); *see also Fellowship of Christian Athletes v. San José Unified Sch. Dist. Bd. of Educ.*, No. 22-15827, 2023 WL 5946036, at *18–21 (9th Cir. Sept. 13, 2023) (same). This Court should not allow religious animus masquerading as "concerns" and "perceptions" to trump Title VII. Indeed, as this en banc Court just explained in *Fellowship of Christian Athletes*, the government may not stifle religious exercise based on otherwise neutral rules when the government's actions are motivated by "animosity to religion or distrust of its practices." 2023 WL 5946036, at *21 (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993)).

The panel opinion held that discriminatory remarks do not violate Title VII when they originate from a religious employee's coworkers and the "real issue" is the employer's concern about the perceptions of others. *See Hittle v. City of Stockton*, 76 F.4th 877, 893 (9th Cir. 2023). But there is no place in Title VII for such a heckler's veto. In fact, the U.S. Supreme Court's First Amendment and Title VII cases reject that argument.

In *Kennedy v. Bremerton School District*, the Court rejected the claim that endorsement concerns under the Establishment Clause

allowed a school district to prevent a football coach's on-field, post-game prayer. 142 S. Ct. 2407, 2427 (2022). And in a recent Title VII case about religious accommodations, *Groff v. DeJoy*, the Court confirmed that coworkers' dislike of or hostility to religion are "'off the table' for consideration" of whether there is an "undue hardship" to the employer in accommodating a religious practice. 143 S. Ct. 2279, 2296 (2023). The common thread running through these cases is that neither the Constitution nor Title VII permit a heckler's veto that proscribes religious practice based on "perceptions" or "discomfort." *See Kennedy*, 142 S. Ct. at 2427. That principle applies here.

The petition for rehearing en banc should be granted to allow the full court to correct the panel's misapplication of Title VII to practices considered by critics to be too religious.

## ARGUMENT

The panel opinion held that discriminatory remarks do not violate Title VII when they originate from a religious employee's coworkers and the "real issue" is the employer's concern about the perceptions of others. *See Hittle*, 76 F.4th at 893 ("When discriminatory remarks are merely quoting third parties and the real issue is public perception or other

forms of misconduct (such as engaging in an activity that does not benefit the employer), there is no genuine issue of material fact that the employer was discriminatory."). That understanding of Title VII conflicts with the Supreme Court's First Amendment decisions, its Title VII decisions, and one of the purposes of Title VII itself—to enable religious employees to exercise their faith without fear of losing their jobs.

Chief Hittle was subjected to an inquiry regarding his religious practice that was neither neutral nor respectful. *See Masterpiece*, 138 S. Ct. at 1729. After being instructed by his supervisor to attend (presumably at city expense) some type of public sector leadership training, Chief Hittle reviewed several training programs that were either located outside California or were too expensive for the Fire Department to afford. Chief Hittle was then given four tickets to the Global Leadership Summit at Willow Creek (the Summit), free of charge. *Hittle*, 76 F.4th at 882.

When he and three of his coworkers attended the Summit in a city vehicle and on city time, Chief Hittle was disciplined for—as his supervisor Robert Deis described it—"us[ing] public funds to attend religious events; even if under the guise of leadership development." *Id.*

4

at 883. Ms. Largent, the City's "independent" investigator, called the Summit "a religious event" because it was held at a church, and she characterized it as serving to benefit only "those of a particular religion." *Id.* at 884. According to Ms. Largent, the fact the event was religious "should have alerted Hittle that his participation and that of his managers would not be appropriate." *Id.* In fact, as the panel noted, the allegedly inappropriate religious character of the Summit was the "gravamen of Largent's Report" and the termination notice. *Id.* at 892. At other points in the process, Chief Hittle's supervisors repeated "discriminatory remarks," *id.* at 893, such as the claims that he was part of a "Christian coalition" or a "church clique," *id.* at 881, 884, 888.

Chief Hittle sought Title VII's protection. But the panel held that he had no recourse under Title VII. The panel so held because, among other things, it felt the discriminatory statements of Hittle's supervisors were justified because the statements had originated with his coworkers and his supervisors were concerned about perceptions of "favoritism" by some of Chief Hittle's coworkers. *See id.* at 888–89.

Such an interpretation of Title VII would grant the statute's protection only when a religious employee's coworkers are friendly to

5

religion. That is wrong, and it threatens to strip countless others of Title VII's protection.

## I. Hostility Toward Religious Beliefs On Purportedly "Neutral" Grounds Cannot Stand.

### A. The Constitution Demands "Neutral And Respectful Consideration" Of Religious Activity.

The Supreme Court recently reiterated its instruction that States have an "obligation of religious neutrality" and that "religious hostility on the part of the State itself" is not acceptable. *Masterpiece*, 138 S. Ct. at 1723–24. Thus, when individual religious practices are in question, they are entitled to "neutral and respectful consideration" free of any "hostility" towards religion. *Id.* at 1729.

In *Masterpiece Cakeshop*, the Court found negative comments by members of the Colorado Civil Rights Commission directed at religious beliefs and practices to be particularly indicative of anti-religious bias by government actors. *Id.* at 1729–30. Specifically, it criticized comments by members of the Commission who implied, or said outright, that religious beliefs cannot legitimately be carried into the public square, or that religious people could believe what they want, but could not act on their religious beliefs if they desired to do business in the state of

6

Colorado. *Id.* The Court opined that these "inappropriate and dismissive comments" showed a "lack of due consideration" for free exercise rights and the dilemma faced by religious individuals striving to navigate the challenges of living a faithful life in a diverse and sometimes hostile culture. *Id.* at 1729. The Court criticized the Commission for neglecting its "solemn responsibility of fair and neutral enforcement" of a law that, like Title VII, protects against discrimination. *Id.*

This en banc Court just reaffirmed that principle in *Fellowship of Christian Athletes v. San José Unified School District Board of Education. See* 2023 WL 5946036, at *15–18. There, this Court held that the San José School District's choice to strip the Fellowship of Christian Athletes of its status as a fully recognized student organization failed to provide the "mutual respect and tolerance" for religious views that the First Amendment requires. *Id.* at *23. When "religious animus infects [a government actor's] decision making," the Free Exercise Clause "guarantees protection" for the challenged religious views. *Id.*

While neither *Masterpiece Cakeshop* nor *Fellowship of Christian Athletes* were Title VII cases, they make clear that the Free Exercise Clause bars government actors from exercising their power with hostility

7

against religious individuals. Title VII prevents any discrimination against an employee "because of" religion. 42 U.S.C. § 2000e–2(a)(1). That means that Title VII provides relief to employees who face religious hostility or discrimination—even when the employer has cast that discrimination as based on "concerns" and unsubstantiated "perceptions." *See Hittle*, 76 F.4th at 888.

Even more importantly, government actors may not "pass judgment upon [nor] presuppose[ ] the legitimacy of religious beliefs and practices." *Fellowship of Christian Athletes*, 2023 WL 5946036, at \*15 (quoting *Masterpiece Cakeshop*, 138 S. Ct. at 1731). This Court recognized that this principle applies even if the "'individuals with positions of importance" and "administrators" making the decisions are not a part of a formal adjudicatory body like the Colorado Civil Rights Commission. *See id.* at \*19–20, \*20 n.10.

Denying relief in this case violates these longstanding free exercise principles. Accordingly, this Court should carefully assess such claims to give religious employees the "neutral and respectful consideration" that Title VII and the Constitution demand. *See Masterpiece*, 138 S. Ct. at 1729.

**B.    Chief Hittle Did Not Receive A "Neutral And Respectful" Inquiry Of His Religious Practice.**

For many religious employees like Chief Hittle, the idea of integrating faith with all aspects of their life is essential to their religious identity. Professionals in all fields, including public sector leaders like Chief Hittle, are called to serve God through vocational excellence. This integration of faith and work cannot be confined to one's home or church on Sunday mornings—it is meant to be lived out every day.

When Chief Hittle sought to live out his faith in this way, he was subjected to an inquiry by his supervisors and an outside investigator (Ms. Largent, "The Largent Report") that was decidedly not "neutral and respectful." Comments by Chief Hittle's supervisors reflected a bias against religious activity and expression. Montes admonished Chief Hittle that he "shouldn't be involved" with religious groups, and "as the fire chief, he should refrain from doing any of those types of activities" with other firefighters. *Hittle*, 76 F.4th at 881. In this discussion, Montes had asked Chief Hittle about his "off duty Christian Activities." *Id.* Such targeted comments sound in the same type of animus towards religion that the Supreme Court found unacceptable from members of the Civil

9

Rights Commission in *Masterpiece Cakeshop*. *See Masterpiece*, 138 S. Ct. at 1729–30.

They also bear a striking resemblance to the comments this Court found unacceptable in *Fellowship of Christian Athletes*, where members of the school district's Climate Committee characterized the religious beliefs and practices of the Plaintiffs as "choosing darkness," "perpetuat[ing] ignorance" and "discriminatory in nature." 2023 WL 5946036, at \*20. This Court found such comments to be clear evidence of hostility toward religion. *Id*. Although these comments were not made as part of a formal adjudicatory process, they were still in conflict with the Constitution's prohibition against government actors being motivated by "animosity to religion or distrust of its practices." *Id*. at \*21 (quoting *Lukumi*, 508 U.S. at 547). Religious employees, even leaders like Chief Hittle, are not required to check their religion at the door just because they work for the government.

The City's conclusion that Chief Hittle's attendance at the Summit was only "for his personal benefit," *Hittle*, 76 F.4th at 890, and that he attended only "under the guise of leadership development," *id*. at 883, reflect the City's animus towards activities that are religious. Indeed,

10

the religious nature of the Summit was the "gravamen of Largent's Report," which characterized Chief Hittle's attendance as the "first 'most serious act[ ] of misconduct.'" *Id.* at 892, 884 (alteration in original). And according to Mr. Deis, "us[ing] public funds to attend religious events" was simply "not acceptable." *Id.* at 883.

The conclusion that the conference was of "no value" to the City overlooks the fact that in a time of financial crisis—when the City was willing to pay for Chief Hittle to travel out of state to attend leadership training—Chief Hittle was able to secure training for himself and three other leaders of the department at no cost to the city. He was also able to travel there using routinely available city resources, rather than expending additional travel funds. At a minimum, Chief Hittle saved resources the city would have had to expend sending him to another event farther away.

The conclusion that it was "unacceptable" for Chief Hittle to attend the Summit "on city time" when he would have attended any other leadership training (which the city presumably would have paid for) on city time, reveals the true animus underlying the City's decision: Chief Hittle's supervisors (and the investigator they hired) simply believe that

11

leadership principles learned from a religious perspective—or merely learned *in a church*—are "worth less" than comparable secular activities.

The City would have to believe that Chief Hittle would be unable to apply these particular leadership lessons to his job as Fire Chief simply because they were learned in a religious context or from religious teachers. These conclusions reflect a "religious hostility on the part of the [City]" that the Constitution prohibits. *See Masterpiece*, 138 S. Ct. at 1724; *see also Fellowship of Christian Athletes*, 2023 WL 5946036, at *3 (quoting *Kennedy*, 142 S. Ct. at 2416) ("[T]he government may not 'single out' religious groups 'for special disfavor' compared to similar secular groups.").

## II. A Coworker's Hostility To Religion Does Not Insulate An Employer From The Requirements Of Title VII.

The panel opinion held that "[w]hen discriminatory remarks are merely quoting third parties and the real issue is public perception or other forms of misconduct (such as engaging in an activity that does not benefit the employer), there is no genuine issue of material fact that the employer was discriminatory." *Hittle*, 76 F.4th at 893. In the panel's view, the disparaging remarks and other statements by Chief Hittle's supervisors merely "show[ed] concerns about other persons' perceptions,"

such as the "legitimate concern that the City could violate constitutional prohibitions and face liability if it is seen to engage in favoritism with certain employees because they happen to be members of a particular religion." *Id.* at 889 (referring to the supervisors' "legitimate constitutional and business concerns").[2]

In other words, religious discrimination does not violate Title VII as long as it is based on the perceptions and statements of a religious employee's coworkers. But that conflicts with the Supreme Court's First Amendment decisions, with its Title VII decisions, and with the purpose of Title VII's prohibition against religious discrimination.

### A. The Supreme Court Has Held That Perceptions and Discomfort Do Not Justify Government Censorship.

---

[2] Even if the panel opinion can be read to refer to Title VII alone, and not the Establishment Clause, that does not save it. The Supreme Court has already rejected coworkers' perceptions and discomfort as a basis for rejected religious accommodations under Title VII, *see Groff*, 143 S. Ct. at 2296, and the same rationale applies here. But to the extent that the panel's language can be read to refer to the Establishment Clause, the Petition for Rehearing En Banc explains why obsolete endorsement concerns do not justify religious discrimination either. *See* Appellant's Petition for Rehearing En Banc at 7–11, *Hittle*, 76 F.4th 877 (No. 22-15485); *see also Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1164 (9th Cir. 2022) (quoting *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427 (2022)) (noting that "the Establishment Clause does not 'compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious'").

The Supreme Court has long prevented the government from stifling unpopular speech based on concerns about the public's reaction. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 880 (1997) (rejecting anti-indecency provisions of the 1996 Communications Decency Act that would have "confer[red] broad powers of censorship, in the form of a 'heckler's veto'"); *Terminiello v. City of Chicago*, 337 U.S. 1, 4–5 (1949) (holding that the First Amendment prohibits the government from outlawing speech just because it angers or disturbs the public). The alternative—allowing the government to suppress views just because they are unpopular—"would be a complete repudiation of the philosophy of the Bill of Rights." *Murdock v. Pennsylvania*, 319 U.S. 105, 116 (1943).

But as the Court's religion jurisprudence developed, government actors faced the prospect that allowing religious activity could expose them to liability if it was perceived as "endorsing" religion. *See, e.g.*, *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 621 (1989) (holding that displaying a crèche in the county courthouse violated the Establishment Clause because it appeared to endorse religious beliefs). This threatened to chill religious exercise in the name of establishment concerns, despite the fact that the "Constitution [ ] itself

14

gives 'religion in general' preferential treatment." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 400 (1993) (Scalia, J., concurring in judgment).

But the Supreme Court addressed this issue in *Good News Club v. Milford Central School*, 533 U.S. 98 (2001). There, it "decline[d] to employ Establishment Clause jurisprudence using a modified heckler's veto" in a case where a school district denied a Christian student club after-hours access to school facilities. *Id.* at 119. When the Court put *Lemon* and its endorsement test to rest in *Kennedy v. Bremerton School District*, it also reiterated that "the Establishment Clause does not include anything like a 'modified heckler's veto, in which . . . religious activity can be proscribed' based on 'perceptions' or 'discomfort.'" *Kennedy*, 142 S. Ct. at 2427 (quoting *Good News Club*, 533 U. S. at 119). As this Court has recognized, "the Establishment Clause does not 'compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious.'" *Waln*, 54 F.4th at 1164 (quoting *Kennedy*, 142 S. Ct. at 2427).

**B.    The Panel's Explanation Repeats Arguments That The Supreme Court Has Rejected.**

The Supreme Court has also rejected the modified heckler's veto in the context of religious accommodation under Title VII.  There, too, the ghoul of *Lemon* cast a long shadow.  *Trans World Airlines, Inc. v. Hardison*, which narrowed Title VII's protections for religious employees seeking accommodations, was thought by many to have been driven by Establishment Clause concerns.  *See Groff*, 143 S. Ct. at 2290 n.9 (noting that "[a] few courts assumed that *Hardison* actually was an Establishment Clause decision" and that "[s]ome constitutional scholars also suggested that *Hardison* must have been based on constitutional avoidance").  But *Groff* did away with *Hardison*'s "de minimis" standard, reiterating that Title VII demands more than "mere neutrality" towards religion—rather, it gives religious employees "'favored treatment' in order to ensure [their] full participation in the workforce."  *Id.* (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015)).  *Groff* also recognized that the Establishment Clause concerns that influenced *Hardison* are no longer present today.  *Id.* at 2289 (describing *Lemon* as "abrogated").

16

The Court clarified in *Groff* that employers may not cite "bias or hostility" to religion by coworkers as grounds for an undue hardship. Such "'impacts' on coworkers" are "off the table." *Id.* at 2296. Similarly, government employers may no longer point to establishment concerns as a basis for denying religious accommodations. *Cf., e.g.*, *Berry v. Department of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (holding prior to the decisions in *Kennedy* and *Groff* that allowing a social worker to "discuss religion with the Department's clients" was an undue hardship because it threatened "violations of the Establishment Clause"). Indeed, "[i]f bias or hostility to a religious practice . . . provided a defense to a reasonable accommodation claim, Title VII would be at war with itself." *Groff*, 143 S. Ct. at 2296.

The panel's explanation for why there was no religious discrimination here repeats arguments—whether for censorship of speech or restriction of religious exercise—that the Supreme Court has rejected. The panel dismissed Chief Hittle's allegations of religious discrimination stemming from the use of pejorative terms and other statements by Chief Hittle's supervisors, holding that such language merely "show[ed] concerns about other persons' perceptions" and

17

"reflect[ed] Montes's legitimate concern that the City could violate constitutional prohibitions and face liability if it is seen to engage in favoritism with certain employees because they happen to be members of a particular religion." *Hittle*, 76 F.4th at 889.

The result of the panel's logic is this: An employer can overcome a religious discrimination claim by showing that some coworkers have an unfavorable view of another employee's religious exercise. As was the case here, in a workplace where some coworkers are unfamiliar with or hostile to certain religious practices, their animus can easily translate into discriminatory remarks and complaints about alleged "religious favoritism." *See id.* at 888–89. The employer can then cite those unsubstantiated "perceptions" to squash the employee's religious exercise. And if the employee responds with a Title VII religious discrimination claim, the employer may defend by arguing that the discriminatory actions started with the coworkers, not the employer—or in any event, the employer is simply trying to avoid any perception of religious favoritism.

That is not how Title VII works. The Supreme Court has explained that Title VII demands more than "mere neutrality" towards religion.

Instead, it gives religious employees "'favored treatment' in order to ensure [their] full participation in the workforce." *Groff*, 143 S. Ct. at 2290 n.9 (quoting *Abercrombie*, 575 U.S. at 775). To that end, Title VII's prohibition on discrimination is straightforward: "an employer who intentionally treats a person worse because of [religion]—such as by firing the person for actions or attributes it would tolerate in an individual of another [religion]—discriminates against that person in violation of Title VII." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020). An employer may not escape that obligation by relying on "concerns" prompted by discriminatory remarks from coworkers or other third parties. *But cf. Hittle*, 76 F.4th at 888.

The outcome of a religious discrimination claim should not rely on the temperament of a religious employee's workplace, on misconceptions about his religious exercise, or on the attitudes of his coworkers. Such a result is inconsistent with a core function of Title VII—permitting space for religious exercise in the workplace. *See Abercrombie*, 575 U.S. at 775.

## CONCLUSION

"Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a

sanctuary or on a field, and whether they manifest through the spoken word or a bowed head." *Kennedy*, 142 S. Ct. at 2432–33. The petition for rehearing en banc should be granted to ensure that this Court's Title VII jurisprudence aligns with that goal.

Date: September 15, 2023    Respectfully submitted,

s/*Christopher T. Holinger*
Christopher T. Holinger, VSB #92693
*Robertson Center for*
*Constitutional Law*
REGENT UNIVERSITY SCHOOL OF LAW
1000 Regent University Drive
Virginia Beach, VA 23464
Tel. 757-352-4908

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing amicus brief complies with the type-volume limit of 9th Cir. R. 29-2(c)(2), 9th Cir. R. 27-1(1)(d), and 9th Cir. R. 32-3(2), because it contains 3,867 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f), as calculated by the word-processing system used to prepare this brief. I certify that the brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

*s/Christopher T. Holinger*
Christopher T. Holinger

Date: September 15, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 15, 2023. I certify that all participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

s/*Christopher T. Holinger*
Christopher T. Holinger